Dave FLEISCHER, individually and as Trustee in dissolution of Fleischer Studios, Incorporated, a Florida corporation, Plaintiff,

v.

A. A. P., INC., et al., Defendants.

United States District Court
S. D. New York.

Sept. 12, 1963.

See also 163 F.Supp. 548.

———◆———

Gustave B. Garfield, New York City, for Dave Fleischer etc.

Phillips, Nizer, Benjamin & Krim, New York City, for Paramount.

Stanley H. Handman, New York City, for Fleischer Studios, Inc.

McCauley, Henry & Brennan, New York City, for King Features.

Mendes & Mount, New York City, for A. A. P. Inc. & Assoc. Artists.

Goldstein, Golenbock & Barell, New York City, for U. M. & M. TV Corp.

Bobrow, Handman & Katz, New York City, for Max Fleischer.

Seligson, & Morris, New York City, for Dumont Broadcasting.

RYAN, Chief Judge.

This suit, alleging conspiracy among eleven defendants to destroy plaintiff's rights under an agreement dated May 24, 1941, seeks to recover damages by way of an accounting and asks for injunctive relief against alleged unfair competition. Five of the defendants have moved for summary judgment on the ground that a prior State Court final determination constitutes *res judicata* or judicial estoppel of the claims in suit.

It is urged that *res judicata* or collateral estoppel arises from a final judgment against this plaintiff rendered in two suits jointly tried in the Supreme Court of the State of New York, namely, Fleischer v. W. P. I. X., Inc., and Fleischer v. N. T. A. Pictures, Inc. Defendants contend that this judgment conclusively disposed of all of the plaintiff's claims and contentions in the instant suit, and especially since plaintiff's appeals from this judgment were dismissed.[1]

Defendants move for summary judgment and dismissal on the additional and independent ground that the suit must be dismissed as a matter of law because the agreement of May 24, 1941, about which this suit revolves, vested in Paramount full and complete rights to exploit and sell the cartoons in suit, without plaintiff's consent, and that Paramount did not violate any duty under this agreement by selling said cartoons for

television; (2) that the plaintiff has no right or standing to maintain this suit because he was neither a party to the agreement nor a third party beneficiary thereof; and (3) that all claims asserted herein have abated under the applicable Florida law. These contentions are pleaded as affirmative defenses and were the defenses pleaded by defendant "NTA" and upheld after trial in the State Court suit.

The complaint as originally filed in October, 1957, and amended in November, 1957 asserted three "Causes of Action".[2] Again in 1960, the complaint was amended following an order striking certain allegations and dismissing the second "Cause of Action", an antitrust claim, as barred by the statute of limitations (Fleischer v. A. A. P., D.C., 180 F. Supp. 717). We have now a further amended complaint and it is to this that we address ourselves.

Plaintiff, suing individually and as Trustee in dissolution of Fleischer Studios, Incorporated, a Florida corporation, alleges that it was the producer of motion picture cartoons which were distributed by defendant Paramount under a series of contracts; that, in exchange for a loan from Paramount, there was an assignment of rights in said cartoons which assignment was subject to a license agreement between The King Features, the owner of the copyright in what is known as the "Popeye" cartoons, and plaintiff producer. Plaintiff alleges that, pursuant to this license, plaintiff produced "Popeye" cartoons and created the character "BLUTO" (the heavy or villian in these cartoons), of which it was

---

1. Plaintiff instituted two suits in the New York Supreme Court, one against W.P. I.X. and one against NTA, which were ordered consolidated for trial and the complaints dismissed on 4/3/61, 30 Misc.2d 17, 213 N.Y.S.2d 632, appeal dismissed 14 A.D.2d 846, Nov. 1961; and 11 N.Y.2d 876, 227 N.Y.S.2d 913, 182 N.E.2d 403 (Mar. 1962), cert. den. October, 1962, 371 U.S. 16, 83 S.Ct. 59, 9 L.Ed.2d 50. Another suit filed against defendant Paramount in the New York Supreme Court was dismissed by that Court on 1/22/63.

2. First "Cause of Action": for unfair competition and an accounting alleging conspiracy to destroy plaintiff's rights under the agrecment of May 24, 1941; Second "Cause of Action": violation of antitrust laws by the 1938, 1941 contracts by blockbooking plaintiff's films with defendant Paramount's own inferior films; Third "Cause of Action": against defendant W.P.I.X. for invasion of privacy in the unauthorized use of plaintiff's name for the "Popeye" cartoons.

sole proprietor. Plaintiff further alleges that, on May 19, 1941, plaintiff entered into a contract with Paramount (a copy of which is annexed to the original complaint and incorporated by reference, which apparently granted Paramount certain options, which was later superceded by an agreement dated May 24, 1941).

It is alleged that, when this contract was executed, plaintiff was indebted to Paramount in the sum of $100,000.00 and that it had been entered into "with an ultimatum that it was either to be signed forthwith or Fleischer Studios, Fla., would be petitioned into bankruptcy or declared insolvent."

It is also alleged in the complaint that, pursuant to the later agreement of May 24, 1941, plaintiff produced and delivered a series of cartoons referred to as "New Cartoons"; * the characters, copyrights and the right to take out copyrights on them were assigned to Paramount in exchange for which plaintiff was to receive 50% of the net receipts from them.

The complaint continuing alleges that the agreement of May 24, 1941 was not assignable by Paramount except as to the provisions of Article Seventeenth (g) and (h). Those provisions, quoted in the complaint, gave Paramount full rights "to use, sell, license, distribute and exploit" the "New Cartoons" in every medium, including television. It is further alleged that the right given Paramount by the 1941 agreement "to obtain copyrights on said 'new cartoons' * * * was held by the defendant Paramount Pictures, Inc., nevertheless in trust to secure to it the repayment of advances made to it as in the agreement of May 24, 1941 set forth" (although the agreement itself contains no such provision).

There follows an allegation that plaintiff corporation was dissolved by the State of Florida for non-payment of taxes, at which time Dave Fleischer and defendant Max Fleischer were sole directors; that the Florida statutes permit the corporation to continue for three years for the purpose of liquidation and that its directors became its trustees for that purpose.

There are also allegations of some unrelated charges that in a Government suit filed against defendant Paramount, it was found guilty of antitrust violations and that the provisions of the 1941 agreement are violative of this decree and unenforceable as in restraint of trade. Interspersed, too, we read unrelated and disconnected allegations of alleged antitrust violations by Paramount in that it has engaged in "block-booking" through the 1941 contract and the sales made thereunder, all in alleged violation of the decree entered against it.

It is alleged further that Paramount in violation of its duty as "pledgee" of the copyright on the new cartoons conspired with the other defendants "to cheat, defraud and destroy the contractual and property rights of plaintiff" in that defendant parted with plaintiff's property in some of the "Popeye" cartoons and "The Raven" under a purported release from Dave Fleischer and that defendant and The King Features sold all the new "Popeye" cartoons to defendants A. A. P., Inc., and Associated Artists Productions, Inc., without accounting to plaintiff for the profits from this "exploitation". The complaint also alleges that, through its subsidiary, Paramount unlawfully sold the cartoon "Mr. Bug Goes to Town" to a "strange corporation" in violation of plaintiff's right to participate in the proceeds of the exploitation of the cartoon and in violation of its "trust relationship" and permitted a sale of these rights to defendant AAP, Inc., and Associated Artists Productions, Inc., U. M. & M. TV CORP., and Flamingo Films, Inc. The complaint also alleges that these defendants and W. P. I. X. have authorized television stations to use these cartoons commercially with plaintiff's name as director without the consent of plaintiff and without paying plaintiff 50% of the money earned from this commercial use. The complaint also charges that defendant UM and MTV Corp. has in furtherance of the conspiracy purchased the

two-reel cartoon film entitled "The Raven" and Dumont has broadcast it with knowledge of plaintiff's rights in said cartoon; and it is alleged that unless restrained defendants will continue to violate and destroy plaintiff's rights.

The relief prayed for is an injunction directed against all defendants, restraining them from further sale, disposition or use of the New Cartoons; a judgment directing delivery of the New Cartoons; an accounting; damages for unfair trade practice, unfair competition and breach of the contract, dated May 24, 1941.

A declaratory judgment is also sought declaring that the 1941 contract is in violation of the antitrust laws and the decree entered against Paramount, and that the release executed by Dave Fleischer is void and of no effect on plaintiff individually and as Trustee in dissolution.

It is defendant's position that the entire action here revolves around an interpretation of the 1941 contract, which has been construed adversely to plaintiff's claim by the New York Supreme Court in the jointly tried suits before Judge Baer of that Court. To this contention plaintiff replies that by the amended complaint and the evidence, "there are a vast number of factual issues tendered which were not even remotely touched upon by Justice Baer and as to which he had no jurisdiction."

That we may determine whether the prior litigation has judicially finally adjudged the merits of the claim now asserted, we must first look at the pleadings in the two State Court suits and the decision of the trial Judge, thus ascertaining what was there litigated and determined. Then, we must examine the issues tendered by the complaint in the instant suit.

*Analysis of the Present Amended Complaint.*

Plaintiff admits the execution of the 1941 contract. Plaintiff describes it as an agreement under which plaintiff assigned all its physical assets to defendant Paramount and undertook the production of the "New Cartoons"—12 "Pop-

eye", 10 "Superman", 6-reel feature "Mr. Bug Goes to Town", and the two-reel cartoon "The Raven".

In the 1941 contract, it is specifically provided that all prior agreements are cancelled and terminated.

By its own pleadings, the rights of plaintiff are to be measured and construed by the terms of the 1941 contract, which relates solely to the "New Cartoons". It is with respect to the "New Cartoons" only that plaintiff seeks relief. Any claim of right, therefore, deriving from any prior agreement such as that of 1938 which preceded the 1941 agreement, cannot be asserted in this suit and will not be considered on this motion. (See Fleischer v. AAP, Inc., D.C., 163 F. Supp. 548, 562, aff'd 2 Cir., 264 F.2d 515, where, on plaintiff's motion to disqualify defense counsel, this Court construed the contract as a transfer to Paramount of the "Fleischers' property interest in all of the movie cartoons that they had owned or made prior to the date of the contract." (163 F.Supp. p. 559) and, as to the first "Cause of Action" under the former complaint, held that the "open issue for litigation involves the interpretation of the 1941 contract." (163 F. Supp. p. 560). It was on this same motion and with respect to that cause of action that plaintiff then stated in an affidavit:

> "The issues between [defendant] Paramount and myself are governed by contract dated as of May 24, 1941 and will be resolved more as a matter of law than by extensive factual disputes * * *". (Affidavit of Dave Fleischer, sworn to Nov. 11, 1957 ¶ 10, quoted in 163 F.Supp. 548, supra at 562.)

The Court, also, on other motions, described the suit as one relating to plaintiff's right under an original agreement of May 24, 1941.

The issues of fact which, according to plaintiff's contentions, were not litigated in the State Supreme Court suit, are summed up by plaintiff and are claimed to arise from: (1) Paramount's failure

to allocate any part of the $500,000 received on the sale to NTA of the "Bug" Cartoon;[3] (2) failure to exploit "Mr. Bug Goes to Town" from 1946 to 1956; (3) failure to account to plaintiff for the $82,555.96 value of the positive prints of the "Mr. Bug" cartoon (which Paramount sold to NTA and the price of which was included in the unrecouped balance due Paramount by plaintiff; (4) failure to account[4] to plaintiff for the alleged illegal blockbooking sale of the Superior 12 "Popeye" cartoons directed by plaintiff along with the 107 allegedly inferior ones to PRM Inc.; for the alleged illegal sale of "Mr. Bug Goes to Town" with 6 other cartoons to NTA; (5) failure to account for the sale of 10 "Superman" cartoons to Flamingo Films; (6) the deprivation of plaintiff's rights in "The Raven" and the "Popeye" cartoon by an agreement of release made between Paramount and Max Fleischer on payment of $3,500 to Fleischer Studios, New York; (7) the conspiracy between defendants UM & MTV, Dumont Broadcasting Corp. and Paramount to acquire "The Raven"; and (8) a claim against defendants AAP, Inc., Associated Artists Productions, Inc., and W. P. I. X. of unlawful use for commercial purposes of the 117 "Popeye" cartoons bearing plaintiff's name.

This latter claim, says plaintiff, was never determined by the trial Judge in the State Supreme Court (Judge Baer) because the evidence on this was excluded by the Court as irrelevant to the civil rights claim against W. P. I. X. and the contract suit against NTA. Now, says plaintiff, the charge that such use constituted a breach of the 1941 contract was never tried by Judge Baer, nor was the claim that defendant The King Fea-

tures had licensed the use of plaintiff's name in connection with the "Popeye" cartoons without plaintiff's consent and that it was accountable to plaintiff for profits.

And these, according to plaintiff, are the issues raised by its present complaint and not raised in the State Court suit before Judge Baer. We now turn to the issues where were raised by the pleadings there.

*The Pleadings in the State Supreme Court suit of Fleischer v. NTA Pictures, Inc., et al.*

The plaintiff's amended complaint against N. T. A. Pictures, Inc., sought, as does the instant complaint, an injunction and an accounting with respect to the sale and exploitation on television of the cartoon "Mr. Bug Goes to Town" and a declaratory judgment that such sale was of the longest and only feature-length cartoon among the "New Cartoons" provided for in the May 24, 1941 agreement, and as one of the cartoons is involved in this action.

The suit, as here, is brought by the plaintiff individually and as Trustee in dissolution and by Dave Fleischer as Receiver of Fleischer Studios and relies on the identical Florida statutes.

The State Court complaint recites the execution of the 1941 agreement between plaintiff and Paramount and alleges that it was personal and not assignable. It also recites the production of "Mr. Bug Goes to Town" and its assignment pursuant to the 1941 agreement subject to Paramount's obligation to credit or pay plaintiff 50% of the proceeds; the assignment by Paramount of the cartoon to Paramount Pictures, Inc., and then to "Rainbow", both of which assignments

---

3. It appears that after the sale to Rainbow in July, 1956, all rights in stock were sold to NTA as was title to the cartoon "Mr. Bug Goes to Town", preserving plaintiff's rights under the 1941 agreement to share in the proceeds after recoupment of advances by Paramount.

4. Accounting is claimed to be due because although the copyrights on all these car-

toons were assigned to defendant Paramount, assignments were subject to a "servitude", which required Paramount to pay or credit 50% of the amount received from their commercial exploitation; all of which sales were allegedly in violation of the antitrust laws under United States v. Paramount, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260.

were valid subject to the equitable servitude, and finally the assignment to NTA which was invalid because made free of any such servitude on behalf of plaintiffs.

The difference then between the complaint there and in this Court is that the defendant NTA there is not *named* a defendant here; that only one of the "New Cartoons" is in suit while here we have all in suit; that no antitrust violation is alleged and no recovery sought in that respect and no claim or relief sought in connection with the release by defendant Fleischer.

What the two complaints do have in common is that they both plead a claim of right arising out of the same 1941 contract on the ground that the contract was personal and that Paramount could not lawfully divest itself of its acquired rights by selling the cartoons.

The defenses raised by NTA were summarized in the State Court suit by Judge Baer:

"(a) that under the May 24, 1941 agreement Paramount acquired absolute rights * * * and therefore had a right to sell the cartoon, (b) that Fleischer was not a party to the agreement and therefore could not assert a claim in his individual capacity (c) that * * * Fleischer Studios * * * had been dissolved by a Governor's Proclamation in 1946 and under the Florida statutes any cause of action had abated, (d) that Fleischer could not assert an action on behalf of Fleischer Studios either in the capacity of Trustee or Receiver, and (e) that Fleischer's prayer for a declaratory judgment is wholly academic * * * and that he has no present rights under said agreement." (30 Misc.2d at 19, 213 N.Y.S.2d at 635)

More fully expanded, the defense that defendant acquired absolute rights to the cartoon and that it owes plaintiff nothing is based on the 1941 agreement under which plaintiff produced and directed the new cartoons at Paramount's expense—Paramount having advanced plaintiff a total of $713,000 out of which only $240,000 was recouped, leaving a balance of $473,000—and that plaintiff's right to receive a stipulated percentage of the proceeds did not ripen until Paramount had recouped completely its advances, and this it never did.

These are the defenses interposed in the present action (in combined form, but identical in substance).

*The Pleadings in Fleischer v. W. P. I. X., Inc.*

In the other State Court suit of Fleischer v. W. P. I. X., Inc. (a defendant here), the complaint alleged a violation of the Civil Rights Law in the use of plaintiff's name in connection with certain television showings of a number of "Popeye" cartoons.

In the complaint in the suit before us, plaintiff alleges, under several early contracts (1932, 1935, 1937), the creation and production of "Popeye" cartoons under a license received from the copyright owner The King Features to exploit these cartoons for theatrical purposes which did not include television or commercial purposes; that this license expired at the end of a 10-year period from the date of release of the cartoon (that being 1952 at the latest) and required plaintiff licensee to destroy the negatives of such cartoons and that these rights were not assignable by plaintiff producer without the licensee's consent; that plaintiff produced the agreed number of cartoons, which bore the name of the producer. Plaintiff then alleges the 1941 agreement with defendant Paramount which included "Popeye" cartoons as the new cartoons which they allege were produced under the license with The King Features, which forbid televising or exhibiting after 1952. Plaintiff, however, alleges the assignment to Paramount of the right to take copyrights on these and pleads the alleged personal and non-assignability nature of this contract.

Plaintiff also alleges the dissolution of plaintiff and the Florida statute; the

assignment by Paramount of its assets to Paramount Pictures. Plaintiff then alleges the formation of PRM and Associated Artists Productions, Inc., and a contract entered into on June 27, 1956 between PRM and Paramount and Hearst (as successor of The King Features) which purported to assign to PRM the right to televise commercially all the "Popeye" cartoons; that defendant W. P. I. X. since 1956 and continuously has done so in knowing violation of plaintiff's rights under Sections 50 and 51, New York Civil Rights Law, McKinney's Consol. Laws, c. 6; the unauthorized execution of the release by Max Fleischer of any of the plaintiff's rights in the new "Popeye" cartoons. The payment of $8500 is then alleged. It is then alleged that plaintiff's reputation as an artist has been irreparably harmed by such commercial use of his name. For this, plaintiff seeks an injunction against further use of his name for advertising purposes, and $100,000 compensating and $100,000 exemplary damages. The charge here made is identical to that in the complaint before us; i. e., the unauthorized use of plaintiff's name in the commercial use of the "Popeye" cartoons.

W. P. I. X.'s principal defense was "that plaintiff gave written consent to the use of his name in connection with the exploitation of the cartoon films in question" under the very same agreement of May 24, 1941 (30 Misc.2d at 19, 213 N.Y.S.2d at 635) and consequently that there was and is no invasion of privacy or violation of the New York Civil Rights Law.

We have noted that plaintiff's two suits in the New York Supreme Court against W. P. I. X., Inc. and N. T. A. Pictures, Inc. were, on defendants' motion, ordered to be tried jointly by that Court. Although the complaint against N. T. A. is, on its face, closer to the complaint in the suit before us, the two defendants, to obtain a consolidated trial, had to establish that both suits "grew out of the same set of facts" and involved common questions of law. (New York

Civil Practice Act, § 96–a.) The State Court, in its opinion granting the motion, held that "Both actions have closely related questions * * *." (N.Y.L.J. Nov. 7, 1960, p. 14, col. 2) And the State Court trial Judge, after reviewing the pleadings and the evidence, held:

"The underlying facts are similar for both cases. * * * the May 24, 1941 agreement * * * is the heart of both of these lawsuits." (30 Misc.2d 17 at 19–20, 213 N.Y.S. .2d 632 at 635)

Since the 1941 agreement explicitly cancelled all prior agreements, the only contract to be construed is that one, as it was the only one before the State Court trial Judge, Judge Baer, to whose decision we now turn, mindful too of the issues which plaintiff says were not before him.

That Court stated: "To determine the issues here involved, it will be necessary to construe the agreement of May 24, 1941 * * * between Paramount and Fleischer Studios,". This agreement that Court summed up: Articles FIRST and THIRD, in addition to cancelling all prior agreements, vested in Paramount full and absolute rights in all of Fleischer Studios' assets and pre-existing cartoons, and all characters contained therein "free and clear of all * * * claims and demands whatsoever" and "without any payment or accounting whatsoever." Under Article FOURTH, Paramount, its successors, assigns and licensees, is given the right to use the name "Fleischer Studios", "Max" and "Dave Fleischer" in connection with the production, distribution, use, "television exploitation" etc., of the cartoon. (And simultaneously the individual Fleischers executed a letter agreement approving this use of their name and of Fleischer Studios.) Under Articles NINTH and FOURTEENTH, "The New cartoons and all parts and other materials thereof * * *, including but not limited to * * * all characters contained therein or created or used therefor" also became "the sole and exclusive property of Paramount absolutely and forever." Article

SEVENTEENTH specified Paramount's rights of distribution and exploitation, including television and "the right to use, sell, license, distribute and exploit the new cartoon[s]" for all purposes, "all without any necessity for consulting with, or obtaining the consent or approval of, the Producer." Article TWENTY-SEVENTH (c) provided that no third party or person was to have any rights under the contract, and Article TWEN-TY-SEVENTH (f), while restricting assignment of the agreement itself, provided that nothing therein "shall prevent Paramount from freely transferring or assigning this agreement or from freely licensing or granting any rights" under the above-mentioned provisions of Article SEVENTEENTH.

On the basis of these provisions, the State Court trial Judge, Judge Baer, held:

"The new cartoons (including Mr. Bug) as well as all the materials and characters therein were the 'sole and exclusive property of Paramount absolutely and forever' and further, 'Paramount may do any and all things and make any and all uses thereof' (Article Fourteenth). * * including the right of sale, all of which flowed from Paramount's ownership of the cartoons (Article Seventeenth (g)). Finally, Article Twenty-seventh (f) gave Paramount the right to freely assign, license, or grant any of its rights acquired under the agreement." (30 Misc.2d at 24, 213 N.Y.S.2d at 641)

It was also adjudged in the State Court that Paramount had an absolute right to sell "Mr. Bug Goes to Town" to N. T. A.; that it had done so in compliance with its duty to use its best efforts as required under Paragraph 17(g) to exploit the cartoon and that, since it had preserved Fleischer Studios' right under the 1941 agreement in its agreement with Rainbow and its 1956 agreement with NTA, Fleischer Studios could not claim any injury suffered by it as a result of the sale of the "Mr. Bug Goes to Town" cartoon (213 N.Y.S.2d 632 at p. 641).

The State Court flatly rejected the plaintiff's argument that the sale was void because the contract was personal and unassignable on the wording of the contract itself, which limited the personal aspects to financing by Paramount and production by the plaintiff as well as in the circumstances surrounding the sale, when plaintiff owed Paramount $470,000 and the cartoon had been unproductive for ten years. So far, issues numbered 1, 2, 3, part of 4, as stated by plaintiff in this suit and enumerated before, were finally determined by Judge Baer.

The State Court trial Judge, "in the hope of once and for all ending what appears to be interminable litigation", considered the other defenses raised by defendants there as well as here and held that, as a matter of law and as a matter of fact, plaintiff individually had no standing to sue.

Judge Baer held:

"The preamble to the contract states that the agreement is entered into between 'Paramount' and 'Fleischer Studios.' The contract is signed 'Paramount Pictures Inc.' by 'Austin Keogh, Vice President' and 'Fleischer Studios, Inc.' by 'Max Fleischer, President.' Article 'Twenty-seventh (c)', set forth above, clearly manifests an intention to preclude any third person mentioned in the agreement from receiving any rights or benefits thereunder. The agreement intended that all of the respective rights and correlative duties set forth therein flow only between Paramount and Fleischer Studios." (30 Misc.2d p. 27, 213 N.Y.S.2d 643)

██ Independently and on the law and facts, we agree with Judge Baer; the ruling there made by him as to plaintiff's capacity to sue under the contract is binding on this Court, and on this ground the motion for summary judgment against Dave Fleischer must be granted.

██ We also conclude that any claim that the corporate plaintiff Fleischer

Studios might have had abated on May 16, 1949, at the end of three years following its dissolution on May 16, 1946, by reason of Florida statutes (Title 34 Corporations and Business Trusts, Secs. 608.29, 608.30, F.S.A.) invoked by plaintiff in support of its claim both in the State Court and here. Under those statutes, Judge Baer held (citing this Court):

> "The above-cited sections provide that a corporation which has been involuntarily dissolved, as was Fleischer Studios, has a continued life for a period limited to three years after dissolution. Any claims the dissolved corporation may have had, after this three-year period, are deemed to have abated (Walder v. Paramount Publix Corp., D.C.S.D. N.Y.1955, 132 F.Supp. 912, 917–919)." (213 N.Y.S.2d p. 644).

He held, too, that a belated 13-year late appointment of plaintiff as Receiver of the corporation would not revive the defunct claim.

This was also this Court's holding in the instant suit, and was the basis for denial of leave to file a supplemental complaint alleging plaintiff's appointment as Receiver of the dissolved corporation. "The appointment of plaintiff did not revive a claim which had died \* \* \* [n]or does his appointment amount to a ruling by the Florida court to the contrary." (180 F.Supp. 717, 725) It was also the determination of the State Court when, on January 22, 1963, it granted defendant's motion to dismiss a complaint brought by plaintiff Max Fleischer against Paramount—"the 6th action commenced against this defendant." "There seems to be no doubt with respect to the contention of \* \* \* res judicata. It is enough that it is conclusively established that plaintiff lacks capacity to sue."

Finally, the State Court trial Judge, Judge Baer, refused to enter a judgment declaring that the exploitation of "Mr. Bug" cartoon by NTA was subject to an "equitable servitude". Pointing out that in compliance with the 1941 contract, Paramount had in its sale to NTA protected plaintiff's rights to a share in the proceeds from the exploitation of this cartoon, after Paramount had recouped its advances of $470,000., an event which had not taken place, the Court saw no controversy justifying such a declaration, and rejected the argument that a fiduciary relationship had been created by the contract. "Fleischer Studios and Paramount were dealing with one another at arm's-length" (213 N.Y.S. 2d p. 646). Judge Baer upheld all of the defenses asserted by NTA, and held that each "standing alone is sufficient to defeat Fleischer's (in all of his individual and collective roles) claims"; and this disposes of another aspect of issue numbered 4 of plaintiff's list, heretofore enumerated.

Judge Baer also considered the allegations of the complaint against W. P. I. X. (a defendant here), which concern the "Popeye" cartoons, the largest group of cartoons in suit here, and which alleged that plaintiff's name had been used for commercial purposes without consent (because the contract giving Paramount such rights was personal and unassignable). W. P. I. X. had acquired these cartoons from PRM, who had purchased the cartoons from Paramount subject to the right of the King Features, the copyright owner, from whom it acquired the television rights. Judge Baer held that this contention was " \* \* \* \* permeated with the same legal infirmities as is his similar contention in Action No. 2 (against N. T. A.)—and for the same reasons previously discussed. The right to the use of the names was an inextricable part of the absolute ownership rights which Paramount acquired under the May 24, 1941 agreement." Indeed, the very terms of Articles "FOURTH" and "NINETEENTH" completely answer the contention that only Paramount had the consent to use the names.

This conclusion was also the basis for a denial of a temporary injunction in a previous suit filed by the plaintiffs to

restrain W. P. I. X. from televising the cartoons. It was found that:

> "Plaintiffs assert that they produced the cartoons for distribution in motion picture theatres, and not for use in connection with commercial advertising or for use on commercial television—the use to which the films are intended to be put. But that fact is immaterial, inasmuch as plaintiffs have sold and transferred all rights in the films, without reserving to themselves any right which would prevent their exhibition on television (see Autry v. Republic Productions, 213 F.2d 667)." Fleischer Studios, Incorporated and Max Fleischer v. W. P. I. X., Inc. (Sup.Ct. N.Y.Co., Index No. 11017, 1956; N.Y.L.J. Sept. 10, 1956, p. 6, col. 3].

Judge Baer concluded that no claim of invasion of privacy could be maintained because plaintiff had given written consent in connection with the distribution of these cartoons, which had nothing to do with the 10-year limitation set by The King Features on the license of its copyright ante the 1941 contract, and also because in any event no commercial use had been made of plaintiff's name.

This disposes of plaintiff's issues numbered 7 and 8 (which purport to allege "copyright infringement and unfair competition" in a CHARACTER in the "Popeye" cartoon but really assert unlawful use by defendants of the "Popeye" cartoon.

The two decisions of Judge Baer estop plaintiff from any further litigation arising out of the contract of 1941. The issue was the same in all three suits—plaintiff's rights against Paramount and those claimed under Paramount under the 1941 contract; final judgment was rendered on the merits on that issue against plaintiff that defendant Paramount had not breached its contract with plaintiff when it sold, assigned and transferred to the other defendants sued and that plaintiff had no claim.

The liability asserted against the defendants arose from the alleged breach of contract. It follows that a finding of no breach of contract by Paramount is a finding of no liability on the part of any of these defendants since the essential element of the case against them is a breach of the contract.

While only W. P. I. X. was a defendant in the State Court suit, since the liability of all defendants arises out of the same issue which was determined, all defendants may claim the benefit of that decision. Israel v. Wood Dolson Co., 1 N.Y.2d 116, 151 N.Y.S.2d 1, 134 N.E. 2d 97; First Congregational Church v. Evangelical & Reformed Church, 305 F. 2d 724 (C.A.2, 1962). "[W]hen a party has been defeated in a claim because one of its elements was decided against him, he must accept as conclusive the decision as to that element, when it arises as a constitutent of a claim against another obligor." Civoru v. N. B. C., et al., 261 F.2d 716 (C.A.2, 1958).

Plaintiff has been adjudged to have no claim arising out of this contract; he may not, therefore, assert this claim in any suit respective of the defendant.

The doctrine applies even more so here where there is identity of defendants— W. P. I. X.—and where the liability asserted against all the defendants derives from the liability asserted against defendant Paramount.

A finding of no liability on the part of Paramount is a finding of no liability on the part of any of the defendants as to any and all the cartoons, the new cartoons, which were the subject matter of the contract. If Paramount had the right to sell the "Popeye" and "Bug" cartoons, it had the right to sell the "Superman" and "Raven" cartoons. No release was necessary (Issues Nos. 4, 5, 6 as enumerated above)

The final judgments rendered in the New York Supreme Court in the actions by this plaintiff against W. P. I. X., Inc., and N. T. A. Pictures, Inc., on Judge Baer's opinion, constitute *res judicata* against plaintiff in the instant action. Furthermore, under each of the

three grounds underlying that judgment, even independently of the estoppel effected by it, plaintiff has no claim.

Summary judgment is granted, dismissing the complaint as against all of the defendants with costs to be taxed. The Clerk is directed to forthwith enter judgment accordingly.

So ordered.